Matthew L. Sharp, Esq.
Nevada Bar No. 4746
MATTHEW L. SHARP, LTD.
432 Ridge St.
Reno, NV 89501
Phone: (775) 324-1500
Email: matt@mattsharplaw.com

*Attorneys for Plaintiff*

[*Additional Counsel Listed Below*]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ALAN W. VIEBROCK, Derivatively on Behalf of NEUROTROPE, INC., <br><br> Plaintiff, <br><br> v. <br><br> SUSANNE WILKE, JOSHUA SILVERMAN, WILLIAM S. SINGER, JAMES GOTTLIEB, KENNETH J. GORELICK, SHANA KAY PHARES, BRUCE T. BERNSTEIN, and ANDREW D. PERLMAN, <br><br> Defendants, <br><br> and, <br><br> NEUROTROPE, INC., a Nevada Corporation <br><br> Nominal Defendant | Case No.: <br><br> **VERIFIED SHAREHOLDER** <br> **DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Alan W. Viebrock ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Neurotrope, Inc. ("Neurotrope" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available

1

information, including filings by Neurotrope with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Neurotrope against certain of its officers and directors seeking to remedy Defendants' (defined below) breach of fiduciary duties and unjust enrichment that occurred between January 7, 2016 to the present (the "Relevant Period") and have caused substantial harm to Neurotrope.

2.      Neurotrope is a clinical stage biopharmaceutical company that specializes in the development of therapeutics to treat neurodegenerative diseases, including Alzheimer's disease ("Alzheimer's" or "AD").

3.      Throughout the Relevant Period, the Company's most advanced product in treating Alzheimer's was Bryostatin-1 ("Bryostatin").  According to the Company, Bryostatin purportedly modified the effects of AD by repairing damaged synapses between neurons.

4.      After reporting purportedly positive results from the Phase 1 and 2a clinical trials, the Company initiated a Phase 2b clinical trial designed to evaluate the safety, tolerability, and efficacy of Bryostatin in the treatment of moderately severe to severe patients with Alzheimer's on January 7, 2016.  The Phase 2b trial enrolled 147 patients in a randomized, double-blinded, placebo-controlled study and tested Bryostatin at two doses -- 20 microgram and 40 microgram.

5.      The primary efficacy endpoint of the trial was the Severe Impairment Battery ("SIB") and the secondary efficacy endpoints were the Mini Mental State Exam ("MMSE"), Activity of Daily Living ("ADL"), and Neuropsychiatric Inventory scale ("NPI").

6.      Patient enrollment was completed on November 22, 2016.  When a clinical trial is fully enrolled, this means every potential patient has been treated and the data is thereafter collected and analyzed.

7.      Since the beginning of the Relevant Period, the Company and certain of its officers and directors have misrepresented the efficacy of Bryostatin.  For example, the Company made materially false and misleading statements that included:

That "Neurotrope is at the forefront of developing a novel therapy to treat and potentially reverse moderate to severe Alzheimer's dementia and other neurodegenerative diseases. The Company's world-class science is a paradigm shifting approach that treats some of the underlying causes of Alzheimer's disease;"

That Neurotrope "may have a breakthrough in Alzheimer's disease and other neurological disorders;" and that

Neurotrope is "pretty excited about our upcoming Phase II topline data in April 2017 . . . which we believe will be a pivotal inflection point - valuation inflection point - for the company;"

8. On May 1, 2017, the Company issued a press release that announced "positive top-line results" of the pivotal Phase 2b trials of Bryostatin. Defendant Daniel Alkon (the Company's President and Chief Scientific Officer) characterized the results as showing "improvement in patients with moderate to severe Alzheimer's disease." However, the underlying trial data flatly contradicted the Company's representations of the results as positive.

9. First, the Company misleadingly omitted any statement pertaining to the efficacy of the 40-microgram dose with regard to either the primary or secondary endpoints. Moreover, the top-line data relating to the 20-microgram dose of Bryostatin failed to produce results that were statistically significant.

10. On this news, the price of the Company's common stock declined from a closing share price of $18.81 per share on April 28, 2017, to a closing share price of $6.97 per share on May 1, 2017, a loss of approximately 63% on heavy trading volume.

11. Since the Company remains under the control and/or influence of the primary wrongdoers, namely Defendants who: (a) have made decisions in violation of the business judgment rule, (b) have substantial conflicts, and (c) may be implicated in the commission of the wrongful conduct alleged herein, the Company is unable to protect itself or remedy the wrongs inflicted upon it. Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of Company.

///

///

///

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

13.     Venue is proper in this Court under 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Company is incorporated in this District.

## THE PARTIES

**Plaintiff**

14.     *Plaintiff Alan W. Viebrock* is, and at all relevant times was, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of Texas.

**Nominal Defendant**

15.     *Nominal Defendant Neurotrope Incorporated* ("Neurotrope") is a Nevada Corporation with its principal executive offices located 205 East 42d Street, 16th Floor, New York, New York 10017.  NTRP shares currently trade on the NASDAQ.

**Director Defendants**

16.     *Defendant Susanne Wilke* ("Wilke") was, at all relevant times, the Chief Executive Officer and a director of the Company.  Defendant Wilke is a citizen of Connecticut.

17.     *Defendant Joshua Silverman* ("Silverman") was appointed to the Board on August 4, 2016.  He is also the Chairman of the Board.  Silverman is currently the Co-founder and Managing Member of Parkfield Funding LLC, and is a former Principal and Managing Partner of Iroquois Capital Management, LLC ("Iroquois").  Silverman also served as Co-Chief Investment Officer of Iroquois from 2003 until July 2016.  Defendant Silverman is a citizen of New York.

18.     On August 4, 2016, the Company entered into a consulting agreement with SM Capital Management, LLC ("SMCM"), a limited liability company owned and controlled by Silverman (the "Consulting Agreement").  Pursuant to the Consulting Agreement, SMCM shall provide consulting services which shall include, but not be limited to, providing business development, financial

4

communications and management transition services, for a one-year period, subject to annual review thereafter.   SMCM's annual consulting fee is $120,000, payable by the Company in monthly installments of $10,000.   In addition, SMCM shall be reimbursed for (i) all pre-approved travel in connection with the consulting services to the Company, (ii) upon submission to the Company of appropriate vouchers and receipts, for all other out-of-pocket expenses reasonably incurred by SMCM in furtherance of the Company's business, and (iii) SMCM's out-of-pocket legal and advisory fees in connection with SMCM's recent involvement with the Company, including, but not limited to, expenses incurred in connection with the proposed consent solicitation and the Consulting Agreement, which reimbursement shall not exceed $50,000.   In addition, the Consulting Agreement provides that effective immediately, Silverman shall be appointed as a member of the Board and that Silverman shall continue to be a member of the Board throughout the consulting term.   The Consulting Agreement further provides that the Board and all applicable committees of the Board shall take all necessary actions to appoint Silverman as Chairman of the Board and as Chairman of the Audit Committee of the Board and that Silverman shall continue to serve as Chairman of the Board and Chairman of the Audit Committee throughout the consulting term.   In addition, the Consulting Agreement provides that the Company shall take all actions within its control, including the recommendation of such director nominee by the Nominating and Governance Committee of the Board, to nominate and appoint one (1) additional member to the Board designated by Silverman during the initial consulting term.

19.   ***Defendant William S. Singer*** ("Singer") was, at all relevant times, a member of the Board and Vice-Chairman of the Board.   Singer is a member of the Audit Committee.   Singer is also the Chairman of the Nominating and Corporate Governance Committee.   Singer served as President of CRE until April 26, 2016 and served on its board of directors.   Defendant Singer is a citizen of New Mexico.

20.   ***Defendant James Gottlieb*** ("Gottlieb") was, at all relevant times, a member of the Board.   Gottlieb is a member of the Nominating and Corporate Governance Committee.   From 2010

///

///

///

through present, Gottlieb serves as a partner with Capitol Counsel LLC.  Gottlieb also serves as a Board of Directors member of CRE.[1]  Defendant Gottlieb is a citizen of Virginia.

21.  **Defendant Kenneth J. Gorelick** ("Gorelick") was, at all relevant times, a member of the Board.  Defendant Gorelick is a citizen of Pennslyvania.

22.  **Defendant Shana Kay Phares** ("Phares") was, at all relevant times, a member of the Board.  Phares also serves as President and Chief Executive Officer at CRE.  Defendant Phares is a citizen of West Virginia.

- As of December 31, 2016, James Gottlieb, a director of the Company, served as a director of CRE, and Shana Phares, also a director of the Company, served as President and Chief Executive Officer of CRE.  Singer was the president of CRE until April 26, 2016.  CRE is a stockholder of a corporation, Neuroscience Research Ventures, Inc. ("NRVI"), which owned 3.9% of the Company's outstanding Common Stock as of December 31, 2016.  Phares is Secretary/Treasurer of NRVI.

- In addition, the CRE License Agreement requires the Company to pay CRE a "Fixed Research Fee" of $1 million per year for five years, commencing on the date that the

---

[1]    The Company has been a party to a technology license and services agreement with the original Blanchette Rockefeller Neurosciences Institute ("BRNI") (which has been known as Cognitive Research Enterprises, Inc. ("CRE") since October 2016), and its affiliate NRV II, LLC, which is collectively referred to as "CRE," pursuant to which the Company has an exclusive non-transferable license to certain patents and technologies required to develop the Company's products.  The Company was formed for the primary purpose of commercializing the technologies initially developed originally by BRNI for therapeutic applications for AD or other cognitive dysfunctions.  These technologies have been under development by BRNI since 1999 and, until March 2013, had been financed through funding from a variety of non-investor sources (which include not-for-profit foundations, the National Institutes of Health, which is part of the U.S. Department of Health and Human Services, and individual philanthropists).  From March 2013 forward, development of the licensed technology has been funded principally through the Company in collaboration with CRE.  Under the CRE License, CRE is a preferred service provider in certain circumstances and the Company may not enter into sublicense agreements with third parties except with CRE's prior written consent, which consent shall not be commercially unreasonably withheld.  Furthermore, the CRE License dated February 4, 2015 revises the agreement that was entered into as of October 31, 2012 and amended on August 21, 2013, in that it provides that any intellectual property developed, conceived, or created in connection with a sublicense agreement that the Company entered into with a third party pursuant to the terms of the CRE License will be licensed to CRE and its affiliates for any and all non-commercial purposes, on a worldwide, perpetual, non-exclusive, irrevocable, non-terminable, fully paid-up, royalty-free, transferable basis, with the right to freely sublicense such intellectual property.  Previously, the agreement had provided that such intellectual property would be assigned to CRE.

Company completes a Series B Preferred Stock financing resulting in proceeds of at least $25,000,000 (the "Series B Financing"). The CRE License Agreement also requires the payment of royalties ranging between 2% and 5% of the Company's revenues generated from the licensed patents and other intellectual property, dependent upon the percentage ownership that NRVI holds in the Company. Under the CRE License Agreement, the Company was required to prepay royalty fees at a rate of 5% of all investor funds raised in the Series A or Series B Stock financings or any subsequent rounds of financing prior to a public offering, less commissions.

23. **Defendant Bruce T. Bernstein** ("Bernstein") was, at all relevant times, a member of the Board. Bernstein is the Chairman of the Audit Committee. Bernstein is also a member of the Nominating and Corporate Governance Committee. Defendant Bernstein is a citizen of New York.

24. **Defendant Andrew D. Perlman** ("Perlman") was appointed to the Board on February 17, 2017. Perlman is a member of the Audit Committee. Defendant Perlman is a citizen of New York.

## AUDIT COMMITTEE CHARTER

25. The Audit Committee (a) assists the Board in fulfilling its oversight of: (i) the quality and integrity of the Company's financial statements; (ii) the Company's **compliance with legal and regulatory requirements** relating to the Company's financial statements and related disclosures; (iii) the qualifications and independence of the Company's independent auditors; (iv) the performance of the Company's independent auditors; and (v) prepares any reports that the rules of the SEC require be included in the Company's annual proxy statement.

26. The Audit Committee has the authority to conduct or authorize investigations into any matters within its scope of responsibility. Its primary duties and responsibilities are to:

- Recommend the appointment and compensation, and oversee the work of any registered public accounting firm (referred to herein as the "independent auditor") employed by the Corporation;
- Resolve any disagreements between management and the auditor regarding financial reporting;
- Pre-approve all auditing and non-audit services;
- Retain independent counsel, accountants, or others to advise the Audit Committee or assist in the conduct of an investigation;

- Seek any information it requires from employees – all of whom are directed to cooperate with the Audit Committee's requests – or external parties;
- Meet with the Corporation's officers, the independent auditor, or outside counsel, as necessary; and
- Oversee that management has established and maintained processes to assure compliance by the Corporation with all applicable laws, regulations, and corporate policy.

27.   The Audit Committee, in its capacity as a committee of the Board, shall:

**Document Review & Reporting Process**

- Review and reassess, at least annually, the adequacy of this Charter, make recommendations to the Board and request approval for proposed changes, as conditions dictate, to update this Charter, and ensure appropriate disclosure as may be required by law or regulation.
- Review with management and the independent auditor the Corporation's annual financial statements and Form 10-K prior to the filing of the Form 10-K or prior to the release of earnings, including a discussion with the independent auditor of the matters required to be discussed under the applicable Statements of Auditing Standards ("SAS").
- Review with management and the independent auditor each Form 10-Q prior to its filing or prior to the release of earnings, including a discussion with the independent auditor of the matters required to be discussed under SAS. The Chairperson of the Audit Committee may represent the entire Audit Committee for purposes of this review.
- Review with management and the independent auditor the effect of regulatory and accounting initiatives that may affect the Corporation, as well as the effect of any off-balance sheet structures and transactions on the Corporation's financial statements.
- Regularly report to the Board about Audit Committee activities, issues, and related recommendations.
- Provide an open avenue of communication between the internal auditing department, the independent auditor, and the Board.
- Report annually to the shareholders, describing the Audit Committee's composition, responsibilities and how they were discharged, and any other information required by applicable rules and regulations, including approval of non-audit services.
- Review any other reports the Corporation issues that relate to Audit Committee responsibilities.
- Perform other activities related to this Charter as requested by the Board.
- Institute and oversee special investigations as needed.
- Confirm annually that all responsibilities outlined in this Charter have been carried out.
- Evaluate the Audit Committee's and each member's performance and qualifications under applicable rules and regulations on a regular basis.

*     *     *

8

**Internal Controls**

- Discuss with management and the independent auditor policies and programs with respect to risk management and risk assessment and inquire about risks or exposures facing the Corporation.
- Understand how the internal auditing department has implemented and maintains the Corporation's internal controls and understand the process for the independent auditor's review of the internal controls, and obtain reports on significant findings and recommendations regarding effectiveness of the controls, together with management's responses.
- Consider and review with the independent auditor the effectiveness of the Corporation's internal control system, including information technology security and control.
- Review management's annual internal control report which acknowledges management's responsibility for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and contains an assessment of the effectiveness of the internal control structure.

## DUTIES OF DEFENDANTS

28.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Neurotrope, Defendants owed Neurotrope and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Neurotrope in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Neurotrope and its investors.

29.     Each director of the Company owes to Neurotrope and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

30.     To discharge their duties, the officers and directors of Neurotrope were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Neurotrope were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects;

(d)     remain informed as to how Neurotrope conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

31.     Each defendant, by virtue of his/her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Neurotrope, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

32.     The Company is a clinical-stage biopharmaceutical company specializing in the development of novel therapeutics to treat neurodegenerative diseases, including Alzheimer's disease.

33.   During the Relevant Period, the Company's most advanced product candidate was Bryostatin.  Bryostatin was designed to induce the growth of mature synapses in the brain and prevent neuronal death.

34.   Prior to the Relevant Period, the Company completed its Phase 1 and 2a studies evaluating the primary endpoint of demonstrating preliminary safety and tolerability of Bryostatin.  The Company announced the results of its Phase 2a clinical study of Bryostatin in a March 17, 2015 press release entitled *Neurotrope Announces Positive Final Results From Its Phase 2a Safety Study for the treatment of Alzheimer's Disease*.

35.   The Company's press release regarding the positive Phase 2a results stated in relevant part:

> Newark, NJ, March 17, 2015 -- Neurotrope, Inc (OTCQB: NTRP) today announced secondary and exploratory endpoint results from its randomized, double-blind, placebo-controlled, single dose Phase 2a clinical trial evaluating bryostatin-1 for the treatment of Alzheimer's disease (AD).  Bryostatin is a potent modulator of an enzyme called protein kinase C epsilon (PKCe).  The Company is approaching the treatment of Alzheimer's disease through the activation of PKCe.  In animal models of Alzheimer's disease, activation of PKCe has been shown to improve learning and memory, induce synaptogenesis or growth of new synapses and prevent neurodegeneration.
>
> ***Final analysis of this Phase 2a safety study, in nine Alzheimer's patients with mild dementia as measured by MMSE-2 scores, confirms the previously announced result. The study has met its primary endpoint demonstrating preliminary safety and tolerability of bryostatin. No safety signals have been identified.***
>
> ***As a secondary objective, the Phase 2a safety study examined the correlation of the changes in PKCe with plasma levels of bryostatin after a single dose.   Preliminary assessment of PKCe levels in peripheral monocytes demonstrated a significant increase in total PKC protein levels at the end of the bryostatin infusion consistent with target engagement.***
>
> Commenting on the study results, Charles S. Ramat, President and Chief Executive Officer of Neurotrope, Inc., said, "We are pleased to confirm the preliminary findings of the Phase 2a study we disclosed last month, the Phase 2a met its primary endpoint, showing good safety and tolerability.  Now we can add that we achieved expected outcomes on the exploratory endpoint of PKCe activation.  While we continue to recognize that this is a small trial population we are still greatly encouraged and intend to move this treatment forward to our next planned clinical trial."

11

An additional secondary objective of the study was the evaluation of efficacy following a single dose of bryostatin. As expected with a single dose of bryostatin, there was no measurable improvement in cognition in this mildly impaired patient population. It is important to note that in previous animal studies improvement of learning and memory was first observed following multiple doses of bryostatin. Warren W. Wasiewski, MD, Executive Vice President and Chief Medical Officer of Neurotrope, noted, "Given these additional encouraging results, we are actively planning our Phase 2b, multi-site, double-blind, placebo controlled trial of approximately 150 patients in moderately severe to severe AD patients." [Emphasis added].

36.     Based on these results, the Company initiated a Phase 2b clinical trial designed to evaluate the safety, tolerability and efficacy of Bryostatin in the treatment of moderately severe to severe patients with Alzheimer's disease.  The Phase 2b trial enrolled 147 patients in a randomized, double-blinded, placebo-controlled study and tested Bryostatin at two doses: 20 microgram and 40 microgram.

### MATERIAL MISSTATEMENTS AND OMISSIONS

37.     On January 7, 2016, the Company issued a press release announcing that the Company was initiating its Phase 2b trial of Bryostatin:

NEWARK, N.J., Jan. 07, 2016 (GLOBE NEWSWIRE) -- Neurotrope, Inc. (OTCBB: NTRP) today announced the initiation of a Phase 2b clinical trial of lead candidate Bryostatin 1 for the treatment of Alzheimer's Disease.

The Phase 2b trial is a randomized, double-blind, placebo-controlled study designed to evaluate the safety, tolerability and efficacy of Bryostatin 1 in the treatment of moderately severe to severe Alzheimer's Disease.  The study, which plans to enroll 150 patients, is currently recruiting subjects at five trial sites in Florida, New Jersey, New York and Ohio. Neurotrope is engaging additional sites for the trial with a goal of over 30 participating sites.

"The initiation of this Phase 2b trial is an important milestone for Neurotrope and our lead compound, Bryostatin-1," said Charles Ramat, President and CEO of Neurotrope. "In a Phase 2a study, Bryostatin proved to be safe and well-tolerated, and demonstrated activation of the PKC epsilon target, which Neurotrope believes results in a cascade effect resulting in synaptogenesis. Damaged synapses are a hallmark of Alzheimer's Disease. *We believe that Bryostatin represents a potential breakthrough in the treatment of this debilitating disease, and look forward to further evaluating its clinical validity in this study.*"

The clinical trial will evaluate two different doses of Bryostatin (20 or 40μg) versus placebo, with a total of seven doses administered over 12 weeks . . . .The primary efficacy endpoint is based on Severe Impairment Battery (SIB) Scale, a benchmark assessment used

extensively in severe Alzheimer's drug trials.  Secondary efficacy endpoints include Activities of Daily Living (ADL), Neuropsychiatric Inventory (NPI) and Mini-Mental State Exam (MMSE).  [Emphasis added].

38.     On February 11, 2016, the Company announced that the first patient had been dosed with Bryostatin.  In the announcement Ramat stated that: "We believe that Bryostatin represents a new and disruptive technology in what has been an unsuccessful war against Alzheimer's disease . . . .  We are excited at being on the cusp of providing a meaningful treatment to this suffering, severely impaired population and their caregivers."

39.     On November 22, 2016, the Company issued a press release announcing that the Company had completed enrollment for its first Phase 2b trial of Bryostatin.  In the press release, Defendant Wilke touted the efficacy and outlook of Bryostatin.  In relevant part, Defendant Wilke stated:

"Bryostatin's multi-modal mechanism of action not only targets the neuronal deficits of AD but also synaptic deficits. This combined mechanism of action through PKC epsilon activation gave the Company the confidence to commit to these trials in moderate to severe patients . . . . *We believe that we may have a breakthrough in Alzheimer's disease and other neurological disorders. With the recently completed financing, we believe that we are in a strong position to negotiate terms with pharmaceutical partners.*"  [Emphasis added].

40.     On December 16, 2016, the Company filed a Form S-1 Registration Statement with the SEC in connection with the issuance of securities under the Securities Act of 1933, which were signed and certified by the Company's Directors (Silverman, Wilke, Singer, Gorelick, Bernstein, Gottlieb, and Phares).  Throughout the Form S-1, the Company reaffirmed the previous statements.

41.     On February 13, 2015, Defendant Wilke presented at the 2017 BIO CEO & Investor Conference (the "Conference") at the Waldorf Astoria Hotel in New York, New York.  At the Conference, Defendant Wilke spoke regarding the Phase 2b trial as well as about the resulting top-line data.  Wilke stated in relevant part that:

"We are pretty excited about our upcoming Phase 2 top-line data in April 2017, as I said in moderate to severe Alzheimer's patients, which we believe will be a pivotal inflection point -- *valuation inflection point* -- for the Company . . . .  We have extensive preclinical data, clinical data, and compassionate use data that leads us to believe that our

mechanism of action can be very effective in reversing Alzheimer's disease." [Emphasis added].

42. On February 28, 2017, the Company issued a press release announcing that it completed dosing and patient monitoring for its second Phase 2b trial of Bryostatin. The Company's press release stated in relevant part:

> NEW YORK, February 28, 2017 /PRNewswire/ -- Neurotrope, Inc. (OTCQB: NTRP), a clinical-stage biopharmaceutical company developing novel therapies for neurodegenerative diseases, including Alzheimer's disease, announced the conclusion of dosing and patient monitoring in its Phase 2 double blind, placebo controlled clinical trial of bryostatin-1 in the treatment of moderate to severe Alzheimer's dementia. Patients underwent a 12-week treatment with bryostatin-1, followed by a 30-day post-treatment evaluation. The study is designed to assess the therapeutic efficacy of bryostatin-1, a PKC epsilon activator. Prior animal studies have demonstrated bryostatin's efficacy for restorative synaptogenesis, prevention of neuronal death, and anti-amyloid, anti-tau metabolism via the activation of PKC epsilon. "*We are very pleased with the execution of the study. It took about 13 months from initiation of randomization of the study to completion the last patient visit," Dr. Susanne Wilke, Chief Executive Officer of Neurotrope stated.*
>
> "*The multi-modal efficacy of bryostatin-1 was extensively studied in both animal models and Expanded Access patients with advanced Alzheimer's dementia. We believe that these studies demonstrated bryostatin's potential to actually improve cognitive functions, not simply slow the rate of cognitive decline," stated Dr. Daniel Alkon, President and Chief Scientific Officer of Neurotrope.* "A reversal of Alzheimer's progression would represent a major step forward in the treatment of Alzheimer's dementia patients after years of failed previous trials by other companies and institutions that predominantly targeted amyloid plaque or tau neurofibrillary tangles. Those trials, thus far, have not achieved a significantly reduced rate of decline or improved cognition in any group of patients diagnosed with Alzheimer's dementia, mild, moderate, or severe," stated Dr. Wilke.
>
> "Although the pathologic hallmarks of Alzheimer's disease, extracellular plaques and intracellular tangles at autopsy, are essential to identify those demented patients who had Alzheimer's dementia, plaques and tangles are not closely related to functional decline. In contrast, the loss of synaptic networks has been found, with numerous autopsy studies, to correlate with the severity of cognitive dysfunction and disease progression," stated Dr. Alkon. "We, at Neurotrope, believe that the regenerative effects of bryostatin's treatment on the synapses, as well as bryostatin's prevention of amyloid and plaque deposition, may not just reduce, but potentially reverse the symptoms, by addressing for the first time many of the major early causes of this devastating disease." [Emphasis added].

14

43.     On March 10, 2017, the Company filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ending December 31, 2016, ("2016 Form 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by Defendant Wilke. Throughout the 2016 Form 10-K, the Company reaffirmed the previous statements.

44.     On March 24, 2017, the Company issued a press release announcing the that Defendant Alkon would present at the Sachs Associates' 2nd Neuroscience Biopartnering and Investment forum held at the New York Academy of Sciences in New York, New York.  In the press release, Defendant Alkon affirmatively touted Bryostatin's efficacy, stating that:

> "Bryostatin-1 **has demonstrated** the potential to prevent neuronal death as well as the well-known brain pathologies, amyloid plaques and neurofibrillary tangles. **Bryostatin's multiple efficacies**, collectively provide an unprecedented opportunity to treat neurodegeneration with a regenerative medicine approach. The Neuroscience Biopartnering & Investment Forum provides a great opportunity to discuss the exciting advances being made in the science of neurodegenerative diseases, promising treatments under development, and bryostatin's position in the arena." [Emphasis Added].

45.     Similar overtly positive representations continued in Form 10-Q's, Form 8-K's, and Company press releases filed or issued throughout the Relevant Period. As investors would soon realize, however, these statements were false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

### THE TRUTH EMERGES

46.     On May 1, 2017, the Company issued a deceptive press release entitled "NEUROTROPE Announces Positive Top-Line Results from Phase 2 Study of Bryostatin-1 for Moderate to Severe Alzheimer's Disease."  The report purported to assert that the results of the Phase 2b trial were significant with regard to Bryostatin's efficacy in treating patients with moderate to severe Alzheimer's disease.  The press release stated in relevant part:

> "*Neurotrope, Inc. (NASDAQ: NTRP) today announced positive top-line results from its Phase 2 study (-202 Study) of Bryostatin-1 in patients with moderate to severe Alzheimer's disease (AD)*, a population not commonly targeted in AD clinical trials. Bryostatin-1, a Protein Kinase C epsilon activator that works through synaptic growth factors, as well as anti-amyloid and anti-tangle signaling pathways in the brain, has been shown, in non-clinical efficacy studies, to induce the growth of mature synapses in the brain and prevent neuronal death.

15

Thus, Bryostatin-1 has a fundamentally different biological mechanism of action with the potential for longer lasting effects than the other currently marketed drugs for AD (e.g., donepezil (Aricept®) and memantine (Namenda®)).

This Phase 2 study was the first repeat dose study of Bryostatin-1 in patients with late stage AD (defined as a Mini Mental State Exam 2 (MMSE-2) of 4-15), *in which two dose levels of Bryostatin-1 were compared with placebo to assess safety and preliminary efficacy (p < 0.1, one-tailed) after 12 weeks of treatment.*  The pre-specified primary endpoint, the Severe Impairment Battery (SIB) (used to evaluate cognition in severe dementia), compared each dose of Bryostatin-1 with placebo at Week 13 in two sets of patients: 1) the modified intent-to-treat (mITT) population (consisting of all patients who received study drug and had at least one efficacy/safety evaluation), and 2) the Completer population (consisting of those patients within the mITT population who completed the 13- week assessment).

Top-line results indicate that the 20 μg dose, administered every two weeks, met the pre-specified primary endpoint in the Completer population, but not in the mITT population. Among the patients who completed the protocol (n = 113), the patients on the 20 μg dose at 13 weeks showed a mean increase on the SIB of 1.5 vs. a decrease in the placebo group of -1.1 (improvement of 2.6) (p < 0.07) (n = 80), whereas, in the mITT population, the 20 mcg group had a mean increase on the SIB of 1.2 vs. a decrease in the placebo group of -0.8 (improvement of 2.0) (p < 0.134) (n = 90).

A total of 147 patients were enrolled into the study; 135 patients in the mITT population and 113 in the Completer population. The Alzheimer Disease Cooperative Study Activities of Daily Living Inventory Severe Impairment version (ADCS-ADL-SIV) was a secondary endpoint. The p values for the comparisons between 20 μg and placebo for the ADCS-ADL endpoint were 0.082 and 0.104, respectively, among the patients who completed the protocol in the mITT population. Analysis of secondary and numerous additional exploratory endpoints are ongoing.

Together these results indicate, in this relatively small trial, that Bryostatin-1, at the 20 μg dose, improved outcomes in important dimensions that are impaired in patients with moderate to severe Alzheimer's disease i.e., cognition and the ability to care for oneself. Since most of the patients in this study were already taking donepezil and/or memantine, the efficacy of Bryostatin-1 was in addition to standard of care.

The safety profile of Bryostatin-1 20 μg was similar to that of the placebo group except for a somewhat higher incidence of diarrhea. Fewer adverse events were reported in patients in the 20 μg group, compared to the 40 μg group.  The mean age of patients in the study was 72 years and similar across all three treatment groups.

'The results of this relatively small randomized, double-blind, placebo controlled study of Bryostatin-1 shows that Bryostatin-1 has the potential to positively impact the lives of these severely debilitated patients with moderate to severe AD, a population that is in dire need of

16

new therapies, especially drugs with a new mechanism of action,' said Dr. Susanne Wilke, Neurotrope's Chief Executive Officer. 'We are excited to take the next steps in advancing the development of Bryostatin-1 to treat this serious disease that every year becomes a larger and larger public health burden in the U.S. and around the world. Additional development, with a path to Phase 3, is clearly warranted.'

'*These results, which show improvement in patients with moderate to severe Alzheimer's disease, the population that is generally recognized as the most difficult to treat, provide exciting evidence of a new therapeutic approach potentially could rejuvenate synaptic networks in the brain*. Improvements across the range of important manifestations of the underlying neurodegenerative disease, as shown in this Phase 2 study, could potentially represent a shift in the paradigm to treat Alzheimer's disease,' said Dr. Daniel Alkon, President and Chief Scientific Officer of Neurotrope. 'I would also like to thank the National Cancer Institute for their generous donation of the Bryostatin-1 we have used in our clinical trials.'" [Emphasis Added].

47.     Contrary to the affirmative representations made by the Company that its Phase 2b trial achieved "positive results," the underlying trial data pertaining to the 20 microgram dose of Bryostatin failed to demonstrate statistical significance with regard to the primary endpoint of efficacy, even for those patients who completed the study.  Moreover, the Company purposefully and misleadingly omitted any data regarding the measurement of efficacy in patients taking the 40 microgram dose of Bryostatin.

48.     On this news, the price of the Company common stock declined from a closing share price of $18.81 per share on April 28, 2017, to a closing share price of $6.97 per share on May 1, 2017, a loss of approximately 63% on heavy trading volume.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

49.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by Defendants.

50.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

51.     Plaintiff is a current owner of Neurotrope stock and has continuously been an owner of Neurotrope stock during all times relevant to Defendants' wrongful course of conduct alleged herein.

Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

52. During the wrongful course of conduct at the Company, the Board consisted of the Defendants named herein. Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

53. The Neurotrope Board is currently comprised of eight (8) members - Defendants Wilke, Silverman, Singer, Gottlieb, Gorelick, Phares, Bernstein, and Perlman. Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

54. Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

55. Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

56. Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

57. Each of the Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

58.     Each of the Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

59.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and by virtue of their efforts to defend the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

60.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS
## ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Wilke

61.     Defendant Wilke is not disinterested or independent and is incapable of considering any demand.  Wilke is an employee of the Company as its CEO and derives substantially all of her income from her employment with the Company, making her not independent.  As such, Wilke cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood.

62.     Further, Wilke is also a defendant in the securities class action entitled *Sean Hinshaw v. Neurotrope, Inc., et al.*, Case 1:17-cv-03718 (S.D.N.Y.) and she faces a sufficiently substantial likelihood of liability for the misconduct alleged herein, and, thus, there is a reasonable doubt as to her disinterestedness in deciding whether pursuing legal action against herself would be in the Company's best interest.

### Defendants Bernstein, Perlman, and Singer

63.     During the Relevant Period, defendants Bernstein (Chairman of the Audit Committee), Perlman, and Singer served as members of the Audit Committee.  Pursuant to the Company's Audit

Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, "(a) assist[ing] the Board in fulfilling its oversight of: (i) the quality and integrity of the Company's financial statements; (ii) the Company's **compliance with legal and regulatory requirements relating to the Company's financial statements and related disclosure**s; (iii) the qualifications and independence of the Company's independent auditors; (iv) the performance of the Company's independent auditors; and (v) prepar[ing] any reports that the rules of the SEC require be included in the Company's annual proxy statement." (Emphasis added). Defendants Bernstein, Perlman, and Singer breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious deficiencies described above. Therefore, Defendants Bernstein, Perlman, and Singer face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them to take action is futile.

**Defendants Gottlieb and Phares**

64.     Defendant Gottlieb serves on the board of directors of CRE and Defendant Phares serves as President and Chief Executive Officer at CRE.

65.     CRE is a stockholder of a corporation, Neuroscience Research Ventures, Inc. ("NRVI"), which owned 3.9% of the Company's outstanding Common Stock as of December 31, 2016. Phares is Secretary/Treasurer of NRVI.

66.     The CRE License Agreement requires the Company to pay CRE a "Fixed Research Fee" of $1 million per year for five years, commencing on the date that the Company completes a Series B Preferred Stock financing resulting in proceeds of at least $25,000,000 (the "Series B Financing"). The CRE License Agreement also requires the payment of royalties ranging between 2% and 5% of the Company's revenues generated from the licensed patents and other intellectual property, dependent upon the percentage ownership that NRVI holds in the Company. Under the CRE License Agreement, the Company was required to prepay royalty fees at a rate of 5% of all investor funds raised in the Series A or Series B Stock financings or any subsequent rounds of financing prior to a public offering, less commissions.

67.     Under the CRE License, the Company may not enter into sublicense agreements with third parties except with CRE's prior written consent.  Furthermore, the CRE License dated February 4, 2015 revises the agreement that was entered into as of October 31, 2012 and amended on August 21, 2013, in that it provides that any intellectual property developed, conceived or created in connection with a sublicense agreement that the Company entered into with a third party pursuant to the terms of the CRE License will be licensed to CRE and its affiliates for any and all non-commercial purposes, on a worldwide, perpetual, non-exclusive, irrevocable, non-terminable, fully paid-up, royalty-free, transferable basis, with the right to freely sublicense such intellectual property.

68.     Under the CRE License, CRE and the Company will jointly own data, reports and information that is generated on or after February 28, 2013, pursuant to the license agreement dated October 31, 2012 and amended on August 21, 2013, by the Company, on behalf of the Company by a third party or by CRE pursuant to a statement of work that the parties enter into pursuant to the CRE License, in each case to the extent not constituting or containing any data, reports or information generated prior to such date or by CRE not pursuant to a statement of work (the "Jointly Owned Data").

69.     The CRE License further requires the Company to pay CRE (i) a fixed research fee equal to a *pro rata* amount of $1 million in the year during which the Company closes on a Series B Preferred Stock financing resulting in proceeds of at least $25 million, (ii) a fixed research fee of $1 million per year for each of the five calendar years following the completion of such financing, and (iii) an annual fixed research fee in an amount to be negotiated and agreed upon no later than 90 days prior to the end of the fifth calendar year following the completion of such financing to be paid with respect to each remaining calendar year during the term of the CRE License.

70.     By virtue of CRE's financial stake in the Company and its binding contractual relationship with the Company, and defendants Gottlieb and Phares' control over CRE, Defendants Phares and Gottlieb lack independence from the other demonstrably interested directors, thus rendering Defendants Phares and Gottlieb incapable of impartially considering a demand to commence and vigorously prosecute this action.

///

///

21

## COUNT I

### Against Defendants for Breach of Fiduciary Duties

71.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

72.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

73.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

74.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to the Company, Defendants caused and facilitated the Company to misrepresent the information above, rendering them personally liable to the Company for breaching their fiduciary duties.

75.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

76.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### Against Defendants for Unjust Enrichment

77.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

78.     By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

79.     During the Relevant Period, Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company stock or Defendants received compensation that was unjust in light of Defendants' bad faith conduct.

80.     Plaintiff, as a shareholder and a representative of the Company, seeks restitution from Defendants and seeks an order from this Court requiring Defendants to disgorge all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties and directing disgorgement by Defendants of all improperly received benefits or compensation;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Awarding such other and further relief as this Court may deem just and proper.

///

///

///

///

///

///

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 3, 2017

Respectfully submitted,

**MATTHEW L. SHARP, LTD.**

By: */s/ Matthew L. Sharp*
Matthew L. Sharp
432 Ridge St.
Reno, NV 89501
Phone: (775) 324-1500
Fax: (775) 284-0675
Email: matt@mattsharplaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY 10016
Phone: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Alan W. Viebrock, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 2nd day of August 2017,

Alan W. Viebrock